# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| TEIJIN AUTOMOTIVE TECHNOLOGIES NA HOLDING CORP.<br><br>      Plaintiff,<br><br><br>v.<br><br><br>SOMPO AMERICA INSURANCE COMPANY,<br><br>      Defendant. | Case No. 1:24-CV-00159<br><br><br><br>**COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

## <u>COMPLAINT</u>

Plaintiff Teijin Automotive Technologies NA Holding Corp. (together on behalf of all insureds, "Teijin") brings this Complaint against the Defendant insurer Sompo America Insurance Company ("Sompo") and alleges, upon knowledge as to its own acts and upon information and belief as to other matters, as follows:

### <u>NATURE OF ACTION</u>

1.      In July 2019, Teijin purchased a manuscript property insurance policy from Sompo ("Policy") that included an "Interruption by Communicable Disease" endorsement. That endorsement provides $50 million in coverage for communicable disease losses—coverage that is not available in a typical property insurance policy with business interruption coverage. The Interruption by Communicable Disease coverage

1

Sompo sold to Teijin is unique because it is triggered merely by the presence of a "communicable disease" at a Teijin property. It does not require any physical harm—or so called "physical loss or damage"—to any building or structure. The "Interruption by Communicable Disease" endorsement requires only the mere presence of communicable disease at a Teijin location and that access to such a location is limited or restricted by either an order of a governmental agency or an officer of Teijin. That is exactly what happened to Teijin when the COVID-19 pandemic hit.

2. In February and March of 2020, Teijin began suffering major losses due to the COVID-19 pandemic and the ubiquitous presence of the communicable disease called COVID-19 at its properties. Because Teijin had purchased this specialized Interruption by Communicable Disease coverage for just such a risk, Teijin submitted a claim to Sompo and expected the insurer to honor its contractual obligations. To Teijin's surprise and disappointment, Sompo denied coverage, taking the position that Teijin's policy was no different than any typical business interruption property policy—even by misrepresenting that the specialized communicable disease coverage was not included in the Policy. After several unsuccessful attempts to get Sompo to reverse its coverage denial, Teijin has been forced to file this coverage lawsuit.

3. Teijin's Interruption by Communicable Disease coverage provides broad coverage for losses relating to communicable diseases. Crucially, by its express terms, it does not require any direct physical loss or damage to property. This Interruption by Communicable Disease coverage therefore is different than the coverage at issue in the

many COVID-19 insurance cases filed involving general business interruption coverage that requires "direct physical loss or damage" to property to trigger coverage.

4. Sompo's failure to pay under its "Interruption by Communicable Disease" coverage endorsement for the losses and extra expenses Teijin sustained during the global COVID-19 pandemic constitutes a breach of contract and is also unreasonable, wrongful, unfair, and deceptive. Further, for reasons detailed in part below and as will be proved at trial, Sompo consciously disregarded Teijin's rights, which constitute breaches of the implied covenant of good faith and fair dealing.

5. Teijin seeks damages for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA) and the North Carolina Unfair Claim Settlement Practices Act (UCSPA); pre-judgment and post-judgment interest; costs and attorneys' fees and costs; exemplary and punitive damages; and such other relief as the Court deems just and proper.

## PARTIES

6. Teijin Automotive Technologies NA Holding Corp. ("Teijin Automotive Technologies") is a Delaware company with its principal place of business in Auburn Hills, Michigan. Teijin Automotive Technologies has facilities throughout North America, Europe, and Asia, including a facility in Salisbury, North Carolina. Teijin Automotive Technologies is a manufacturer of highly-engineered materials for several mobility related industries, including automotive, heavy truck, marine and recreational vehicle segments. Teijin Automotive Technologies is an Insured under the Policy and

3

was formerly known as Continental Structural Plastics, also an Insured under the Policy. Teijin Automotive Technologies is a wholly-owned ultimate subsidiary of Teijin Holdings USA, Inc., which is an Insured under the Policy (Teijin Automotive Technologies NA Holding Corp., together with Teijin Holdings USA, Inc. and all Insureds under the Policy, collectively "Teijin").

7. Teijin owns and/or rents the following insured premises that are the subject of this claim (together, "Insured Plants"):

- Salisbury Plant, 6701 Statesville Blvd., Salisbury, North Carolina 28147 ("Salisbury Plant");

- Sarepta Plant, 26755 Hwy 371, Sarepta, Louisiana 71071 ("Sarepta Plant");

- Huntington Plant, 1890 Riverfork Dr. W., Huntington, Indiana 46750 ("Huntington Plant");

- Carey Plant, 2915 Co Hwy 96, Carey, Ohio 43316 ("Carey Plant");

- North Baltimore Plant, 100 S Poe Rd, North Baltimore, Ohio 45872 ("North Baltimore Plant"); and

- Manchester Plant, 17951 W. Austin Rd., Manchester, Michigan 48158 ("Manchester Plant").

8. Teijin also owns and/or rents the insured premises that are the subject of this claim (together, "Headquarters"):

- 1200 Harmon Rd, Auburn Hills, Michigan 48326

4

- 255 Rex Blvd, Auburn Hills, Michigan 48326

9.  Sompo America Insurance Company is a New York insurer with its headquarters in Charlotte, North Carolina.  It is licensed and authorized to do insurance business in states including Michigan, Louisiana, Indiana, Ohio, and North Carolina.  As stated on the Policy's declarations page, Sompo issued the Policy to Teijin from its office in Charlotte, North Carolina.

## JURISDICTION AND VENUE

10.  The Court has subject matter jurisdiction over all persons and entities named in all subject matters identified in this Complaint pursuant to 28 U.S.C. § 1332(a)(1).  The amount in controversy exceeds $75,000.  There is diversity jurisdiction because Sompo is a citizen of New York and North Carolina and Teijin Automotive Technologies is a citizen of Delaware and Michigan.

11.  The Court has personal jurisdiction over Sompo by virtue of its business activities and operations in North Carolina, including without limitation, securing insurance licenses in North Carolina, and selling and issuing policies that cover North Carolina companies, insured premises, and risks.  Sompo purposefully availed itself of the privilege of doing insurance business in the State of North Carolina, including by handling Teijin's claim for losses suffered at its insured property in Salisbury, North Carolina and issuing the Policy and related coverage decisions to Teijin from its office in Charlotte, North Carolina.

12.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, among other reasons, Sompo sold and issued insurance policies covering insured premises and

risks in the Middle District of North Carolina, including the losses suffered by Teijin at its insured property in Salisbury, Rowan County, North Carolina.

## STATEMENT OF FACTS

**Communicable Disease Coverage Purchased by Teijin**

13. To protect against business income losses, including losses arising from communicable disease, Teijin purchased the "Manuscript Policy Form" commercial property Policy, No. FTM40009J0 from Sompo for the policy period from July 1, 2019 to July 1, 2020.

14. Teijin paid substantial premiums in exchange for Sompo's promise of coverage under the Policy.

15. The Policy provides "all risk" coverage, meaning that it covers losses unless expressly excluded. While some of the Policy's coverages, like business interruption coverage, state that covered losses must be "caused by direct physical loss, damage or destruction," the "Interruption by Communicable Disease" and "Communicable Disease Response" coverages added by Endorsement No. 2 (the "Communicable Disease Coverage Endorsement") have no such requirement.

16. The Communicable Disease Coverage Endorsement provides coverage for "Interruption by Communicable Disease":

**INTERRUPTION BY COMMUNICABLE DISEASE**

If a location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by:

6

1)     an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or

2)     a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such location with the actual not suspected presence of communicable disease.

17.     As for the PERIOD OF LIABILITY, the Communicable Disease Coverage Endorsement states:

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)     starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

2)     not to exceed the time limit of $50,000,000

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

18.     The Communicable Disease Coverage Endorsement also provides "Communicable Disease Response" coverage. It further covers: "the reasonable and necessary costs incurred by the Insured at such location with the actual not suspected presence of communicable disease for the: . . . cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property[.]"

19.     The Communicable Disease Coverage Endorsement does not require "direct physical loss, damage or destruction" in order to trigger coverage under its provisions.

20. The Policy's Interruption by Communicable Disease coverage language is substantially similar to language in policies issued by Factory Mutual Insurance Company, which has recognized this coverage applies to COVID-19-related losses and acknowledged that this coverage does not require physical loss or damage.[1]

21. At all material times, Teijin duly complied with its obligations under the Policy, except any obligations that have been excused or waived.

22. No exclusions in the Policy apply to Teijin's claims.

**The Communicable Disease: COVID-19**

23. The world experienced an unprecedented pandemic as a highly contagious communicable disease caused by a virus quickly spread around the world. This disease has been named "coronavirus disease 2019," abbreviated "COVID-19," with the causative virus, SARS-CoV-2, belonging to a large family of viruses known as coronaviruses.

---

[1] *See, e.g.*, *Amphenol Corp. v. Factory Mut. Ins. Co.*, No. 3:21-CV-102 (OAW), 2023 WL 3057146, at *1 (D. Conn. Apr. 24, 2023); *Froedtert Health Inc. v. Factory Mut. Ins. Co.*, 620 F. Supp. 3d 811, 814 (E.D. Wis. 2022), *aff'd*, 69 F.4th 466, 472 (7th Cir.2023) (noting that the "parties contemplated coverage for the exact losses" caused by the COVID-19 virus with the communicable disease coverages); *ITT Inc. v. Factory Mut. Ins. Co.*, No. 3:21CV00156(SALM), 2022 WL 1471245, at *4 (D. Conn. May 10, 2022); *Live Nation Ent., Inc. v. Factory Mut. Ins. Co.*, No. LACV21-00862 JAK (KSx), 2022 WL 390712, at *6 (C.D. Cal. Feb. 3, 2022); *Nguyen v. Travelers Cas. Ins. Co. of Am.*, 541 F. Supp. 3d 1200, 1227, 1229 (W.D. Wash. 2021) (FM admitted coverage for the plaintiff that claimed the presence of the virus but court held no coverage for the plaintiff that did not allege the presence of the virus); *Zebra Techs. Corp. v. Factory Mut. Ins. Co.*, No. 20-CV-05147, 2021 WL 4459532, at *1 (N.D. Ill. Sept. 29, 2021), *appeal dismissed*, No. 22-1264, 2022 WL 3538326 (7th Cir. May 10, 2022).

24.     In or around January 2020, SARS-CoV-2 (referred to herein as "the COVID-19 virus") and COVID-19 reached the United States and quickly began to spread across the country.  On March 11, 2020, the World Health Organization ("WHO"), "deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction" by governments, characterized COVID-19 as a pandemic.

25.     Throughout 2020, 2021, and 2022, due to the rapid spread and pervasive presence of COVID-19 across the planet, the COVID-19 virus was presumed to be present or imminently present everywhere.  People suffered illness and death from COVID-19 after being exposed to other infectious individuals, or to property that the virus was present on.

26.     Persons with COVID-19 expel the COVID-19 virus as they talk, cough, sneeze, or breathe.  Those individuals release tiny virus-bearing particles that can remain suspended for indefinite periods.  A single sneeze releases a cloud of viral droplets, and the Centers for Disease and Prevention ("CDC") has indicated that normal breathing and talking can spread the virus six feet or more.  Infected individuals also deposit these particles by touching surfaces after touching their eyes, mouth, or nose.

27.     The incubation period for COVID-19—i.e., the time between exposure to the COVID-19 virus and symptom onset—can be 14 days or more.  Studies have found that viral loads—the concentration of virus in an infected person—in pre-symptomatic individuals can be higher than the viral loads in symptomatic individuals.  The CDC estimates that 30% of infected individuals never show symptoms of infection (called "asymptomatic" carriers).  Similar to pre-symptomatic individuals, the viral loads of

9

asymptomatic individuals can be higher than the loads among symptomatic carriers. The CDC estimates that the majority of COVID-19 transmission results from pre- and asymptomatic carriers.

28.     The CDC estimates that the number of people in the United States who have been infected with COVID-19 is likely to be higher than the number of reported cases. For example, in June 2020, the CDC estimated that the number of people infected with COVID-19 was 10 times greater than the 2.4 million cases reported at the time.

**Teijin Suffered Losses that Triggered the Communicable Disease Coverages**

29.     As described above, the Interruption by Communicable Disease coverage is triggered when (i) an insured location has the actual presence of communicable disease and (ii) access to that location is "limited, restricted or prohibited by . . . an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease" or "a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease." Once those two elements have been established, the Policy covers losses incurred "during the PERIOD OF LIABILITY at such location," where PERIOD OF LIABILITY is defined to start at the time of the "order of the authorized governmental agency" and end at "the time limit of $50,000,000." As demonstrated below, Teijin has met the two requirements to trigger coverage.

### *Presence of COVID-19 at Teijin Insured Property*

30.     COVID-19 is a communicable disease that was present, at a minimum, at the Sarepta, Huntington, Salisbury, Carey, Manchester, and North Baltimore Plants, and Headquarters beginning in at least March 2020.

31.     COVID-19 is a communicable disease, which Sompo does not, and cannot dispute.

32.     Because COVID-19 is a communicable disease, it spreads quickly and widely among communities.  Based on government-collected data, COVID-19 was known to be prevalent in the communities surrounding the Sarepta, Huntington, Salisbury, Carey, Manchester, and North Baltimore Plants, and Headquarters at all relevant times.

33.     Unlike many other businesses that fully closed during the pandemic, Teijin's automotive manufacturing operations at the Insured Plants were "essential," because, among other reasons, the Cybersecurity & Infrastructure Security Agency guidance identified businesses in the supply chain for the sale and manufacturing of vehicles as essential critical infrastructure, which was a guidance followed by several government authorities.  Therefore, the Insured Plants remained open to essential workers, although at reduced capacity because of restricted and limited access, and had numerous individuals regularly coming in and out of the facilities.

34.     Given that COVID-19 was everywhere and highly contagious, and the number of contacts Teijin's employees had in the community through their family and social activities, it is statistically certain that COVID-19 was present at each of the

Insured Plants and Headquarters beginning in March 2020, which Teijin will prove at trial.

35.    This presence of communicable disease was evidenced by employees that tested positive for COVID-19 after being present on Teijin's Insured Plants and Headquarters at various times.  For example:

   a.  <u>Salisbury, North Carolina</u>:  On June 23, 2020, an employee at the Salisbury Plant was confirmed by laboratory test to have COVID-19. That employee was present onsite at the plant that same day.  On July 2, 2020, another employee at the Salisbury Plant was confirmed by laboratory test to have COVID-19.  That employee was present onsite eight days prior.  On July 6, 2020, another employee at the Salisbury Plant was confirmed by laboratory test to have COVID-19.  That employee was present onsite eleven days prior.  On July 7, 2020, another employee at the Salisbury Plant was confirmed by laboratory test to have COVID-19.  That employee was present onsite ten days prior.

   b.  <u>Sarepta, Louisiana</u>:  On June 20, 2020, an employee at the Sarepta Plant was confirmed by laboratory test to have COVID-19.  That employee was present onsite at the plant five days before.  On June 30, 2020, another employee at the Sarepta Plant was confirmed by laboratory test to have COVID-19.  That employee was present onsite that same day.

c. <u>Huntington, Indiana</u>: On June 22, 2020, an employee at the Huntington Plant was confirmed by laboratory test to have COVID-19. That employee was present onsite at the plant seven days before.

d. <u>North Baltimore, Ohio</u>: On May 17, 2020, an employee at the North Baltimore Plant was sent home from work after self-reporting COVID-19 symptoms. That employee subsequently tested positive for COVID-19.

36. Additionally, Teijin believes that numerous employees who were onsite at the Insured Plants and Headquarters during the Policy Period had COVID-19, whether symptomatic or asymptomatic, although they did not have laboratory test results due to the United States' limited testing capacity and guidance from government entities cautioning people not to overburden the healthcare system at the beginning of the pandemic.

37. For example, at various times, Teijin attempted to track symptomatic and asymptomatic cases. Based on that tracking, Teijin understood that there were employees with COVID-19 at the Insured Plants as early as March 2020. Teijin tracked at least:

a. 22 symptomatic cases at the North Baltimore Plant on March 23, 2020;

b. 4 symptomatic cases at the Salisbury Plant on March 23, 2020;

c. 1 symptomatic case at the Sarepta Plant on March 30, 2020;

d. 1 symptomatic case at the Manchester Plant on April 4, 2020;

e. 1 symptomatic case at the Carey Plant on April 7, 2020; and

f. 17 symptomatic cases at the Huntington Plant on June 11, 2020.

38.     Further, Teijin learned of other employees with COVID-19 at the Insured Plants and Headquarters throughout 2020.  For example, on March 27, 2020, an employee at Headquarters tested positive for COVID-19; on April 1, 2020, an employee at the Carey Plant tested positive for COVID-19; and on April 20, 2020, an employee at the Manchester Plant tested positive for COVID-19.  By January 2021, there were at least 162 people who tested positive for COVID-19 across the Insured Plants and Headquarters.

39.     These cases indicate that a greater number of individuals had COVID-19 while at the Insured Plants and Headquarters during the Policy Period, even if they did not have laboratory tests due to limited testing capacity and people not getting tested to avoid overburdening the healthcare system.

### *Government Orders and Officer Decisions Regulating COVID-19*

40.     Government orders in Indiana, Ohio, Michigan, North Carolina, and Louisiana, regulating the actual presence of COVID-19, limited or restricted access to the Insured Plants and Headquarters.

41.     On March 6, 2020, Indiana Governor Eric Holcomb declared a public health emergency as a result of the coronavirus disease, Executive Order 20-02.  On March 23, 2020, the Governor ordered all businesses to cease other than Essential Businesses and Operations, Executive Order 20-08.  He further ordered that all Essential Businesses follow Minimum Basic Operations and comply with social distancing requirements by maintaining six-foot distances for all employees.  Additionally, employers were instructed to: "[s]eparate employees who appear to have acute

14

respiratory illness symptoms from other employees and send them home immediately. Restrict their access to the business until they have recovered." The order explained that the COVID-19 virus had "now spread to more than forty (40) counties throughout Indiana and caused several deaths . . . ." This order resulted in a limited and restricted access to the Huntington Plant.

42.     On March 9, 2020, Ohio Governor Mike DeWine declared a state of emergency due to the COVID-19 virus, Executive Order 2020-01D. On March 22, 2020, Director of the Ohio Department of Health, Amy Acton issued a "Stay at Home" order that required all non-essential business and operations to cease. He further ordered that Essential Businesses and Operations operate with Minimum Basic Operations, comply with social distancing requirements by maintaining six-foot distances for all employees, separate employees who appear to have acute respiratory illness symptoms, and have sick individuals stay home. This order resulted in a limited and restricted access to the Carey and North Baltimore Plants.

43.     On March 10, 2020, Michigan Governor Gretchen Whitmer declared a state of emergency in Michigan, Executive Order 2020-4. On March 23, 2020, Governor Whitmer prohibited all in-person work that is not necessary to sustain or protect life or conduct minimum basic operations, Executive Order 2020-21. She further ordered that businesses and operations maintaining in-person activities adopt social distancing practices, restrict the number of workers present on the premises, increase cleaning standards, and prevent workers from entering premises if they display respiratory symptoms or have contact with a person who is known or suspected to have COVID-19.

Case 1:24-cv-00159-WO-JEP   Document 1   Filed 02/28/24   Page 15 of 27

This order resulted in a limited and restricted access to Headquarters and the Manchester Plant.

44.     On March 10, 2020, North Carolina Governor Roy Cooper declared a public health emergency as a result of the coronavirus disease.  On March 27, 2020, the Governor issued a Stay-at Home order, Executive Order 121.  The order pointed to the fact that the North Carolina health department "documented 763 cases of COVID-19 across 60 counties, and has identified the occurrence of widespread community transmission of the virus."  The order reasoned that its measures were necessary "to mitigate community spread of COVID-19 . . ."  It also ordered all non-essential businesses to cease all activities except Minimum Basic Operations.  It further ordered that all Essential Businesses comply with social distancing requirements by maintaining six-foot distances for all employees.  This order resulted in a limited and restricted access to the Salisbury Plant.

45.     On March 11, 2020, Louisiana Governor John Bel Edwards declared a public emergency, proclamation number 25 JBE 2020, as a result of several Louisiana residents testing positive for COVID-19 and based on the "high probability of widespread exposure."  On March 23, 2020, Louisiana Governor Edwards entered emergency proclamation number 33 JBE 2020 in Louisiana, where he referenced the emergency proclamation and added additional restrictions to "mitigate the impact of COVID-19, and to disrupt the spread of the virus."  He put in place a general stay-at-home order unless performing an essential duty.  Businesses were ordered to reduce operations, to use only

essential employees, and to require proper social distancing. This order resulted in a limited and restricted access to the Sarepta Plant.

46. Other state and local orders and actions further limited and restricted access to the Insured Plants.

47. In addition to government orders, Officers of Teijin, including Steve Rooney, CEO; Chris Twining, COO; and Dina Graham, Vice President of Environmental Legal Affairs, Health, Safety and Sustainability issued various procedures and policies in response to the actual presence of COVID-19 onsite at each of the Insured Plants and Headquarters. These orders and procedures restricted and limited access due to the actual presence of the COVID-19 virus at the Insured Plants and Headquarters. These actions included:

    a. On March 17, 2020, Teijin's Vice President of Environmental Legal Affairs, Health, Safety and Sustainability, Dina Graham, issued, and CEO Steve Rooney approved, a COVID-19 Risk Assessment/Health Management Standard Operating Procedure requiring the Insured Plants to adopt rigorous deep cleaning and disinfection procedures and use of isolation rooms in response to employees that become symptomatic or test positive for COVID-19 while onsite. These procedures also set out how to handle employees who are symptomatic or have tested positive for COVID-19, including restricting their access to the Insured Plants for a period of time. These procedures were used in response to the

actual presence of COVID-19 onsite at each of the Insured Plants and

Headquarters.

b. On May 7, 2020, Teijin's Vice President of Environmental Legal

Affairs, Health, Safety and Sustainability, Dina Graham, issued and

COO Chris Twining approved, a COVID-19 Visitor/Contractor Site

Access Protocols document that required each visitor to an Insured Plant

be "essential or business critical." Individuals who did not satisfy the

criteria set forth in that document were restricted from accessing the

Insured Plants.

48. Following these orders, Teijin suffered loss in profits and extra expense

beginning in March 2020. In particular, Teijin suffered staffing issues and reduced

output resulting in substantial lost revenue.

49. Additionally, Teijin incurred costs in undergoing substantial sanitation

efforts, including purchasing and using cleaning and disinfection products, personal

protection equipment, and related items; and hiring outside companies to clean up and/or

remove COVID-19.

**Sompo Failed to Provide Coverage for Teijin's Losses**

50. Teijin notified Sompo of its ongoing losses on June 26, 2020.

51. Sompo's initial coverage response on July 21, 2020 misrepresented the

coverage in the Policy by failing to acknowledge that the Communicable Disease

Coverage Endorsement even existed. In that letter, signed by a senior commercial

property claims specialist in Sompo's Charlotte, North Carolina office, Sompo quoted

several provisions in the Policy, including the first of two endorsements to the Policy, but omitted any reference to the second endorsement to the Policy, the Communicable Disease Coverage Endorsement.

52.     After Teijin provided additional information to Sompo, on June 3, 2021, Sompo sent Teijin a letter saying it would review the new information and re-evaluate its coverage position.  Sompo also requested additional information from Teijin.

53.     After Teijin provided additional information to Sompo in February 2022 in response to Sompo's requests, including providing examples of employees with positive COVID-19 test results who were on site at certain Insured Plants, Sompo denied coverage to Teijin by letter dated March 15, 2022.  Sompo denied coverage despite Teijin establishing all facts necessary to trigger the coverages in the Communicable Disease Coverage Endorsement.

54.     Sompo's coverage denial misleadingly initially suggested the Communicable Disease Coverage Endorsement was not part of the Policy, and then tried to introduce new requirements for coverage not present in the Policy language.  The most egregious example of Sompo's unreasonable, wrongful, unfair, and deceptive actions is its coverage position that the Communicable Disease coverages require "direct physical loss, damage, or destruction" to property, despite the fact that those words appear nowhere in the Communicable Disease Coverage Endorsement.  Because such requirements were not part of the Policy, Sompo's denial did not provide a reasonable explanation of its position based on the insurance Policy language in relation to the facts or applicable law.

55.     Sompo's flawed interpretations attempt to limit coverage retroactively based on language it did not include in the Policy that Teijin purchased.  But Sompo cannot deny coverage based on what it wished it had included in the Communicable Disease Coverage Endorsement.  Further, several of its arguments would render much of the Communicable Disease coverages illusory, which is not permissible under the laws of North Carolina.

## FIRST CAUSE OF ACTION

### FOR BREACH OF CONTRACT

56.     Teijin repeats and re-alleges the allegations of Paragraphs 1–55 as if fully set forth herein.

57.     The Policy constitutes a valid and enforceable written contract under which Sompo agreed, in consideration of the premiums paid, to provide certain insurance benefits to Teijin.

58.     Teijin has suffered losses and reasonable costs in excess of the policy limit of $50 million arising from the COVID-19 virus being actually present at the Insured Plants and Headquarters at a time when access was limited, restricted or prohibited by an order of an authorized governmental agency regulating the actual presence of COVID-19 and by decisions of Teijin officers as a result of the actual presence of COVID-19.

59.     Teijin has complied fully with all of the applicable and necessary terms and conditions of the Policy, and has fulfilled each obligation on its part to be performed, except those which have been excused and/or waived.

60.     No exclusions or other limitations in the Policy bar or limit coverage for Teijin's losses.

61.     Sompo has materially breached and continue to breach its contractual obligations under the Policy by refusing to pay amounts due under the Policy, including without limitation, losses and costs that are covered by the Communicable Disease Coverage Endorsement (as set forth in the Policy).

62.     As a direct and proximate result of Sompo's breach of contract, Teijin has been injured and damaged in an amount exceeding the jurisdictional minimum of this Court, and to be proven at trial.  Teijin is also entitled to prejudgment interest from the date of Sompo's breach.

## SECOND CAUSE OF ACTION

## FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

63.     Teijin repeats and re-alleges the allegations of Paragraphs 1–62 as if fully set forth herein.

64.     The Policy constitutes a valid and enforceable written contract under which Sompo agreed, in consideration of the premiums paid, to provide certain insurance benefits to Teijin.  The Policy contains an implied covenant of good faith and fair dealing.

65.     Sompo at all material times had a duty to act fairly and in good faith towards Teijin in carrying out its responsibilities under the Policy.  Part of its obligation to act fairly and in good faith toward Teijin is its obligation to provide coverage for

covered or potentially covered matters, and to deny coverage only where there is an objectively reasonable and clear basis for denial.

66.     Also part of Sompo's duty to act fairly and in good faith toward Teijin is its obligation to reasonably investigate, consider, and seek to discover evidence which supports coverage. Sompo is obligated to fully inquire into possible bases that might support Teijin's claim.

67.     The implied covenant of good faith and fair dealing further constitutes promises and obligations on the part of Sompo that it would do nothing to injure, frustrate, or interfere with the rights of Teijin under the Policy.

68.     In contravention of its duties and obligations, Sompo has breached the implied covenant of good faith and fair dealing by, among other things:

    a.    failing to seriously evaluate Teijin's claim;

    b.    unreasonably refusing and declining to provide coverage and pay actual losses and costs in connection with Teijin's COVID-19-related claim under the Communicable Disease coverages without a reasonable basis, and in contradiction with governing law;

    c.    deciding without any reasonable basis in fact or law, and for the purpose of placing its interests above those of their policyholders, to take objectively unreasonable positions regarding the interpretation of the provisions of the Policy concerning Teijin's COVID-19-related claim;

    d.    unreasonably refusing to conduct a thorough investigation of

Teijin's claim, and ignoring evidence which supports coverage instead of inquiring into possible bases that might support Teijin's claim;

e.    misrepresenting coverage available under the Policy; and

f.    forcing Teijin to litigate to obtain benefits under the Policy; all in violation of accepted insurance industry customs, practices, standards, and its duties to Teijin.

69.    Sompo did the things and committed the acts alleged above for the purpose of consciously withholding from Teijin rights and benefits to which Teijin is entitled under the Policy, and without considering the interests of Teijin at least to the same extent as it did its own interests.

70.    Sompo's acts are inconsistent with the reasonable expectations of Teijin, contrary to established norms, practices, standards of care and legal requirements related to insurance claims, and contrary to the express terms of the Policy; deprive Teijin of its rights under the Policy and the benefits it expects from the Policy; and constitute bad faith and a breach of the implied covenant of good faith and fair dealing.

71.    Sompo's conduct is and has been undertaken with a conscious disregard of Teijin's rights under the Policy.

72.    In light of information, facts, and relevant law to the contrary, Sompo, by acting as alleged above and as will be proved at trial, consciously disregarded Teijin's rights and has prejudiced Teijin in its ability to resolve and recover for is losses in connection with Teijin's COVID-19-related claim.  Sompo has forced Teijin to incur

substantial financial losses and to take action to pursue the insurance coverage to which Teijin is rightfully entitled. Sompo has established a pattern of wrongly refusing coverage. Sompo has ignored Teijin's interests and concerns through oppressive, malicious, and fraudulent conduct. Therefore, Teijin is entitled to recover punitive damages from Sompo in an amount sufficient to punish Sompo, and to deter similar misconduct in the future.

73. Sompo's acts were performed, authorized and/or ratified by their member officers, directors, and managing agents, and/or with the advance knowledge or conscious disregard of their officers, directors, and managing agents. Sompo's acts were performed, authorized and/or ratified by their corporate affiliates.

74. As a direct and proximate result of Sompo's breaches and violations, Teijin has suffered and continues to suffer substantial damages, in an amount to be determined at trial. Such damages include, among other things, losses in connection with the COVID-19-related claim. Teijin also has incurred and continues to incur significant, recoverable attorneys' fees and costs to obtain the benefits to which it is entitled and which Sompo failed to provide under the Policy.

## THIRD CAUSE OF ACTION

### FOR UNFAIR AND DECEPTIVE TRADE PRACTICES

75. Teijin repeats and re-alleges the allegations of Paragraphs 1–74 as if fully set forth herein.

76. Sompo's actions violate N.C. Gen. Stat. § 58-63-15 (UCSPA), which constitutes an unfair method of competition or unfair or deceptive act or practice in

violation of N.C. Gen. Stat. § 75-1.1 *et seq.* (UDTPA).

77.     Sompo violated N.C. Gen. Stat. § 58-63-15 by, among other things:

     a.     misrepresenting to Teijin that the Policy did not include the Communicable Disease Coverage Endorsement in its initial coverage letter;

     b.     misrepresenting the Communicable Disease policy provisions as they applied to Teijin's claim;

     c.     refusing to pay Teijin's claim without conducting a reasonable investigation into information supporting Teijin's claim; and

     d.     failing to provide a reasonable explanation based on the actual text of the Communicable Disease policy provisions in denying Teijin's claim.

78.     Sompo willfully engaged in the above unfair and deceptive acts or practices and knew or should have known that its actions were frivolous and malicious.

79.     Sompo's unfair and deceptive acts or practices were in and affected commerce.

80.     As a direct and proximate result of Sompo's unfair and deceptive acts or practices, Teijin has suffered and continues to suffer substantial damages, in an amount to be determined at trial. Such damages include, among other things, losses in connection with the COVID-19-related claim. Teijin also has incurred and continues to incur significant, recoverable attorneys' fees and costs to obtain the benefits to which it is entitled and which Sompo failed to provide under the Policy.

81. Teijin is entitled to automatic recovery of treble damages because of Sompo's violations of the UDTPA and UCSPA.

82. Teijin is also entitled to a discretionary award of its attorneys' fees, pursuant to N.C. Gen. Stat. § 75-16.1, and prejudgment interest from the date of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Teijin requests that the Court enter judgment in its favor as follows:

1. Compensatory and consequential damages in an amount to be proven at trial;

2. Treble damages pursuant to N.C. Gen. Stat. § 75-16;

3. Pre-judgment and post-judgment interest at the maximum legal rate;

4. An award of court costs and attorneys' fees and costs incurred in obtaining the benefits due under the Policy;

5. Interest on such court costs and attorneys' fees and costs;

6. Exemplary and punitive damages; and

7. Such other and further relief that the Court deems just and proper.

## JURY TRIAL DEMAND

Teijin hereby demands a jury trial on all issues in this action.

Respectfully submitted,

Dated: February 28, 2024

/s/ Richard C.Worf, Jr.
Richard C. Worf, Jr. (N.C. Bar No. 37143)
ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Suite 1900
Charlotte, NC 28246-0106
Telephone: (704) 377-8135
Email: rworf@robinsonbradshaw.com

*Counsel for Plaintiff*

Darren S. Teshima*
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Email: dteshima@cov.com

Matthew Schlesinger*
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662 5581
Email: mschlesinger@cov.com

*Local Rule 83.1(d) Special Appearance to be filed.

27