IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TEIJIN AUTOMOTIVE TECHNOLOGIES    )
NA HOLDING CORP.                  )
                                  )
             Plaintiff.           )
                                  )        1:24CV159
        v.                        )
                                  )
SOMPO AMERICA INSURANCE           )
COMPANY,                          )
                                  )
             Defendant.           )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This case involves claims arising from the denial of insurance coverage for losses resulting from the COVID-19 pandemic. Plaintiff Teijin Automotive Technologies NA Holding Corporation ("Teijin") alleges claims against Defendant Sompo America Insurance Company ("Sompo") for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices. Before the court is Sompo's motion to dismiss the complaint for failure to state a claim. (Doc. 9.) Teijin has responded (Doc. 16), and Sompo has replied (Doc. 18). The court held argument on the motion on January 21, 2025, and the parties submitted supplemental briefing. (Docs. 24, 25.) For the reasons set out below, the motion to dismiss will be denied.

## I.   BACKGROUND

The facts, based on the well-pleaded allegations of the

complaint, are accepted as true for purposes of the motion to dismiss and are viewed in the light most favorable to Teijin. The insurance policy underlying the parties' dispute was attached to Sompo's motion to dismiss (Doc. 9-2), and the court considers it for the purpose of the pending motion. See Brown Goldstein Levy LLP v. Fed. Ins. Co., 68 F.4th 169, 174 (4th Cir. 2023) ("[W]hen a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." (quoting Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004))). Teijin does not challenge the authenticity of the policy, which was integral to and relied upon in the complaint.

Teijin is "a manufacturer of highly-engineered materials for several mobility related industries, including automotive, heavy truck, marine and recreational vehicle segments." (Doc. 1 ¶ 6.) It is incorporated in Delaware and has its principal place of business in Michigan but has facilities "throughout North America, Europe, and Asia." (Id.) Sompo is an insurer incorporated in New York with headquarters in Charlotte, North Carolina. (Id. ¶ 9.) "It is licensed and authorized to [provide insurance in] Michigan, Louisiana, Indiana, Ohio, and North Carolina." (Id.)

Teijin purchased a manuscript property insurance policy from Sompo in July of 2019. (Id. ¶ 1.) The policy was issued from

Sompo's office in Charlotte, North Carolina. (Id. ¶ 9.) It provides $400,000,000 of "all risk" coverage for "direct physical loss, damage, or destruction to [Teijin's] property." (Doc. 9-2 at 111, 119; see Doc. 1 ¶ 15.) Teijin's six plants in North Carolina, Louisiana, Indiana, Ohio, and Michigan and its headquarters in Michigan are covered by the policy. (Doc. 1 ¶¶ 7-8.) The policy has a number of exclusions. Relevant here, it excludes coverage for "direct physical loss, damage or destruction including costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination" (Doc. 9-2 at 139) and "delay, loss of market, or loss of use" (id. at 141).

The policy period runs from July 1, 2019, to July 1, 2020. (Doc. 1 ¶ 13.) The "Suit Against the Company" section of the policy provides that "any action or proceedings against [Sompo] for recovery of any loss under this Policy shall not be barred if commenced within two years and one day after [Teijin] provides notice to [Sompo], . . . which period shall be tolled from the date of notice until the date that [Teijin] receives [Sompo's] 'Final Coverage Decision.'" (Doc. 9-2 at 155-56.) For covered property in North Carolina, the policy endorsement makes several changes. (See id. at 75-79.) One of those modifications "replace[s]" the Suit Against the Company provision and states that an action under the policy must be "brought within three years

3

after the date on which the direct physical loss or damage occurred." (Id. at 75.)

An endorsement to the policy, Endorsement No. 2 ("Communicable Disease Coverage Endorsement"), provides coverage for "Interruption by Communicable Disease" and "Communicable Disease Response." (Doc. 1 ¶¶ 16-18; Doc. 9-2 at 182-84.) The "Interruption by Communicable Disease" section states:

> If a location owned, leased or rented by [Teijin] has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by:
>
> 1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or
>
> 2) a decision of an Officer of [Teijin] as a result of the actual not suspected presence of communicable disease,
>
> this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by [Teijin] during the PERIOD OF LIABILITY at such location with the actual not suspected presence of communicable disease.

(Doc. 1 ¶ 16; Doc. 9-2 at 182.) The period of liability for this section is defined as "starting at the time of the order of the authorized governmental agency or the Officer of [Teijin]" and not "exceed[ing] the time limit of $50,000,000." (Doc. 1 ¶ 17; Doc. 9-2 at 183.) The section titled "Communicable Disease Response" provides further coverage for "the reasonable and necessary costs incurred by [Teijin]" for "cleanup, removal and disposal" of the disease and "actual costs of fees payable to public relations

4

services or actual costs of using [Teijin's] employees for reputation management." (Doc. 9-2 at 183; see Doc. 1 ¶ 18.) The endorsement excludes from coverage any loss or costs incurred due to "any law or ordinance with which [Teijin] was legally obligated to comply prior to the time of the actual spread of communicable disease." (Doc. 9-2 at 182-83.)

"In February and March of 2020, Teijin began suffering major losses due to the COVID-19 pandemic." (Doc. 1 ¶ 2.) Teijin alleges that COVID-19 was present at its facilities in Louisiana, Indiana, North Carolina, Ohio, and Michigan in March of 2020. (Id. ¶ 30.) It alleges this presence based on the "statistical[] certain[ty]" that COVID-19 would have been at the facilities because "COVID-19 was everywhere and highly contagious" (id. ¶ 34) and on reported cases from employees (id. ¶¶ 35, 37-38). Specifically, on March 27, 2020, an employee at Teijin's headquarters in Michigan tested positive for COVID-19. (Id. ¶ 38.) On April 1, an employee at Teijin's plant in Carey, Ohio tested positive, and on April 20, an employee at the Michigan plant tested positive. (Id.) In May, an employee at the North Baltimore, Ohio plant tested positive for COVID-19, and in June, employees at the North Carolina, Louisiana, and Indiana plants also tested positive. (Id. ¶ 35.) In addition, Teijin "attempted to track symptomatic and asymptomatic cases" at its facilities in 2020, finding that there were symptomatic cases at the following plants:

5

North Baltimore, Ohio (March 23); North Carolina (March 23); Louisiana (March 30); Michigan (April 4); Carey, Ohio (April 7); and Indiana (June 11). (Id. ¶ 37.)

Teijin's facilities remained open throughout the pandemic because its manufacturing operations were deemed essential by governmental authorities. (Id. ¶ 33.) However, access to the facilities was limited. In March of 2020, many governors issued executive orders limiting access to businesses to essential workers and placing social distancing and quarantine restrictions on those workers, including the governors of Ohio (March 22), Indiana (March 23), Michigan (March 23), Louisiana (March 23), and North Carolina (March 27). (Id. ¶¶ 41-45.)

Executives at Teijin also implemented restrictions and procedures "in response to the actual presence of COVID-19 onsite" at its facilities. (Id. ¶ 47.) On March 17, 2020, Dina Graham, Teijin's Vice President of Environmental Legal Affairs, Health, Safety, and Sustainability, issued an order requiring Teijin plants "to adopt rigorous deep cleaning and disinfection procedures and use of isolation rooms in response to employees that [became] symptomatic or test[ed] positive for COVID-19 while onsite." (Id.) This policy also restricted the access of employees who were symptomatic of or tested positive for COVID-19 to Teijin's plants. (Id.) On May 7, 2020, Graham implemented a policy requiring that "each visitor to [Teijin's plants] be

6

'essential or business critical.'" (Id.)

As a result of these orders, "Teijin suffered loss in extra expense beginning in March 2020." (Id. ¶ 48.) It also alleges it experienced "staffing issues and reduced output resulting in substantial lost revenue." (Id.) Finally, Teijin claims it "incurred costs in undergoing substantial sanitation efforts, including purchasing and using cleaning disinfection products, personal protection equipment, and related items; and hiring outside companies to clean up and/or remove COVID-19." (Id. ¶ 49.)

"Teijin notified Sompo of its ongoing losses on June 26, 2020." (Id. ¶ 50.) On July 21, 2020, Sompo responded by a letter from a senior commercial property claims specialist from its Charlotte, North Carolina office without acknowledging the existence of the Communicable Disease Coverage Endorsement. (Id. ¶ 51.) Teijin provided additional information on June 3, 2021, and Sompo informed Teijin that it would "re-evaluate its coverage position." (Id. ¶ 52). Teijin again provided additional information to Sompo in February of 2022, and Sompo denied coverage by letter on March 15, 2022. (Id. ¶ 53.) Teijin alleges that the denial letter "suggested the Communicable Disease Coverage Endorsement was not part of the Policy" and asserted that "the Communicable Disease coverages require 'direct physical loss, damage, or destruction' to property." (Id. ¶ 54.)

Teijin filed this action on February 28, 2024 (Doc. 1), and

Sompo filed its motion to dismiss on June 28, 2024 (Doc. 9). The motion is fully briefed and ready for decision.

## II. ANALYSIS

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to

8

relief above the speculative level," Twombly, 550 U.S. at 555, so as to "nudge[] the[] claims across the line from conceivable to plausible," id. at 570. See Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### A.   Breach of Contract Claim

#### 1.   Choice of Law

Sompo argues that North Carolina law governs the procedural interpretation of the insurance policy and that New York law governs its substantive interpretation. (Doc. 10 at 10-11.) It contends that while the "law of the forum state governs procedural matters" (id. at 10), North Carolina follows the lex loci contractus rule, which prescribes that "an insurance contract is subject to the law of the state where the contract was entered" (id. at 11). Sompo argues that the insurance policy was delivered to Teijin in New York and thus was entered there. (Id. at 11.) In its supplemental brief, Sompo addresses the application of North Carolina General Statute section 58-3-1, which Sompo explains is "a narrow exception to the lex loci contractus rule for cases where a close connection exists between the state of North Carolina and the interests insured by an insurance policy." (Doc. 24 at 4.) Sompo contends that "[n]o such 'close connection' exists here." (Id.)

9

Teijin argues that North Carolina law governs the interpretation of the insurance policy. (Doc. 16 at 18-20.) It contends that section 58-3-1 applies because "North Carolina represents where both parties have a physical presence, where the Policy was issued, and where some of Teijin's loss was caused and felt." (Id. at 19.)

North Carolina indeed employs the lex loci contractus rule to determine which state's law governs the interpretation of a contract. Fortune Ins., Co. v. Owens, 351 N.C. 424, 428 (2000). Therefore, the law of the state where the last act to make a binding contract occurred - usually the delivery of the policy in the insurance context - will govern. Id. Section 58-3-1 creates an exception to this general rule for "[a]ll contracts of insurance on property, lives, or interests in [North Carolina]," requiring that they are "deemed to have been made within [North Carolina] and are subject to the laws thereof." To ensure compliance with the Due Process Clause of the Fourteenth Amendment, the Supreme Court of North Carolina has determined that North Carolina must have a "close connection" to the interests insured for its law to apply. Collins & Aikman Corp. v. Hartford Acc. & Indem. Co., 436 S.E.2d 243, 246 (N.C. 1993).

While the insurance policy lists a New York address for Teijin's mailing address (Doc. 9-2 at 6), the complaint does not allege where the policy was delivered. Additionally, the complaint

10

lists six plants and two buildings, referred to as Teijin's headquarters, as the insured facilities that are the subject of its claims. (Doc. 1 ¶¶ 7-8.) However, it is not clear whether these are the only facilities covered by the policy. For example, the policy includes provisions that change the policy terms for Teijin's property in California (Doc. 9-2 at 40-44), Georgia (id. at 45-49), New York (id. at 71-74, 86), and South Carolina (id. at 84-85, 88-90). Neither party has addressed the extent of the insured property under the policy, and the policy is 183 pages long (see Doc. 9-2). It is not the court's burden to search the record for this information. See, e.g., Johnson v. City of Shorewood, 360 F.3d 810, 817 (8th Cir. 2004) ("It is not a court's obligation to search the record for specific facts that might support a litigant's claim."); Ritchie v. Glidden Co., 242 F.3d 713, 723 (7th Cir. 2001) ("[A] court is not required to scour the record in search of evidence to defeat a motion.") (internal quotation marks omitted); Krakauer v. Dish Network, L.L.C., No. 1:14-CV-333, 2018 WL 11429948, at *5 (M.D.N.C. Jan. 25, 2018). On the current record, the parties have not adequately set out, nor can the court determine, whether the interests insured by the policy have a "close connection" to North Carolina. A more fulsome indication of the interests insured is necessary. Thus, without more, the court cannot determine whether to apply either the lex loci contractus rule or section 58-3-1.

11

At the hearing on the motion, Sompo argued that the court should decide the choice of law issue at this stage because it is relevant to the determination of whether direct physical loss or damage has occurred.  (Doc. 23 at 4:4-7.)  But, as explained in Section II.A.3 below, the parties now concede that the existence of direct physical loss or damage is no longer at issue.  And New York and North Carolina law are otherwise consistent on the issues relevant to the breach of contract claim.  For example, both states require contracts to be interpreted according to their plain and ordinary meaning, see Consol. Rest. Operations, Inc. v. Westport Ins. Corp., 235 N.E.3d 332, 336 (2024); Integon Nat. Ins. Co. v. Villafranco, 745 S.E.2d 922, 925 (N.C. Ct. App. 2013), and when an insurance contract is ambiguous, both states agree that the contract should be construed against the insurer, see Consol. Rest. Operations, Inc., 235 N.E.3d at 336; Cowell v. Gaston Cnty., 660 S.E.2d 915, 918 (N.C. Ct. App. 2008).  Therefore, the court at this early stage need not choose between North Carolina or New York law for purposes of the present motion.

### 2.  Suit Limitation Provision

Sompo argues that Teijin's action is untimely.  In its initial brief, Sompo contended that the endorsement titled "North Carolina Changes," which provides that an action under the policy must be "brought within three years after the date on which the direct physical loss or damage occurred," applies.  (Doc. 10 at 11-12.)

12

Sompo argued that Teijin began suffering losses in February of 2020, and so it had until February 2023 to file its lawsuit. (<u>Id.</u> at 14.) However, at the hearing, Sompo argued that while the three-year limitation applied to claims of direct physical loss under the general policy provisions, the two-year limitation found in the "Suit Against the Company" provision, accruing from the date of the final coverage denial, applied to claims of other losses, including those under the Communicable Disease Coverage Endorsement. (Doc. 23 at 11:5-8, 13:4-10.) Sompo contended that the insurance claim was first denied in February 2021, and that the two-year limitations period ran from then until Sompo re-evaluated the coverage decision in June 2021. (<u>Id.</u> at 15:16-25.) When the claim was denied again in March 2022, Sompo contended, the period resumed running and thus the two-year limitations period expired in late November 2023, some three months prior to Teijin filing this action. (<u>Id.</u> at 16:7-21.)

Teijin similarly argues that the two-year limitation applies. (Doc. 16 at 14.) However, it contends that this period began running in March 2022, when Sompo's denial letter was issued, and thus its action, filed on February 28, 2024, was timely. (<u>Id.</u>)

The policy's "North Carolina Changes" endorsement measures three years from the date of "direct physical loss or damage." (Doc. 9-2 at 75.) The parties agree that no such damage is alleged (Doc. 23 at 59:18-60:5), and so this provision is not applicable.

13

Sompo raised its argument that the two-year limitation applies to Teijin's claim, as well as its construction of the way to count the running of the two-year period, for the first time at oral argument. For the purpose of the present motion, therefore, it is waived. See In re Crop Prot. Prods. Loyalty Program Antitrust Litig., No. 1:23-md-3062, 2025 WL 315835, at *12 (M.D.N.C. Jan. 28, 2025) (citing United States v. Bowles, 602 F.3d 581, 583 n.* (4th Cir. 2010)). However, even if not waived, Sompo's argument fails at this stage. Aside from Sompo's proposed manner of counting the two-year period, the complaint does not allege that a denial letter was sent in February 2021. Rather, it alleges that the final denial letter was issued in March 2022, resulting in a two-year limitation period that would expire in March 2024, subsequent to the filing of the complaint. (See Doc. 1 ¶ 53.) Therefore, the court cannot conclude at this pleadings stage that this action is time-barred. Dickinson v. Univ. of N.C., 91 F. Supp. 3d 755, 763 (M.D.N.C. 2015) ("To succeed on a statute-of-limitations defense at [the motion to dismiss] stage, all facts necessary to show the time bar must clearly appear 'on the face of the complaint.'" (quoting Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007))). Sompo's motion to dismiss on this basis will therefore be denied.

14

### 3. Coverage Under the Communicable Disease Coverage Endorsement

In Sompo's briefing, it argued that Teijin's insurance claim was not covered by the policy because (1) no physical loss or damage occurred (Doc. 10 at 15), (2) the loss of market and loss of use exclusions applied (id. at 18), (3) the claim was barred by the policy's pollution and contamination exclusion (id. at 18-19), and (4) the Communicable Disease Coverage Endorsement did not apply because "Teijin did not identify any order restricting access to its property as a result of the actual presence of Covid-19 on its premises" (id. at 17). At the hearing, however, the parties agreed that Teijin is only seeking coverage under the Communicable Disease Coverage Endorsement and, therefore, whether physical loss or damage occurred and whether the policy exclusions apply are no longer relevant issues. (Doc. 23 at 59:18-60:5.) Sompo does maintain that Teijin has not alleged any qualifying orders under the Communicable Disease Coverage Endorsement because the orders by state governments and Teijin officers identified in the complaint were "based on the general spread of COVID-19, not the actual presence of COVID-19 at the property," as required by the endorsement. (Id. at 27:14-16; see also id. at 28:18-25, 29:3-9; Doc. 18 at 6.) It also contends that the endorsement's exclusion for costs and losses due to "any law or ordinance with which [Teijin] was legally obligated to comply prior to the time of the

15

actual spread of communicable disease" applies to Teijin's claimed losses because they are due "to government orders that were issued prior to the alleged infection of its employees." (Doc. 10 at 17-18.)

Teijin argues that the five government orders and two orders by Teijin officers described in the complaint are qualifying orders under the Communicable Disease Coverage Endorsement. (Doc. 16 at 24-27.) It highlights the different language used to describe the two types of qualifying orders in the endorsement: the government order must be "regulating the actual not suspected presence" of COVID-19, while the decision of the Teijin officer must be "a result of the actual not suspected presence" of COVID-19. (Doc. 9-2 at 182 (emphasis added); see Doc. 16 at 24-26.) Teijin argues, therefore, that the government orders need not be "a result of" the presence of COVID-19 but must simply "regulat[e]" COVID-19. (Doc. 16 at 25-26.) Teijin adds that the endorsement's exclusion for losses due to a "law or ordinance with which [it] was legally obligated to comply prior to the time of the actual spread of communicable disease" does not apply. (Doc. 23 at 57:6-58:3.) It contends that the exclusion's language, given the contrast with the endorsement's language about qualifying orders, should be interpreted to refer to "basic health and safety regulations." (Id. at 57:15-21.)

16

To trigger coverage under the Communicable Disease Coverage Endorsement, a Teijin property must have the "actual not suspected presence of communicable disease," and the access to such property must be "limited, restricted or prohibited" by either "an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease" or "a decision of [a Teijin officer] as a result of the actual not suspected presence of communicable disease." (Doc. 9-2 at 182.) Sompo concedes that Teijin has alleged the actual presence of COVID-19 at Teijin facilities (see Doc. 23 at 26:12-17) but contests whether the government and officer orders identified in the complaint are qualifying orders under the endorsement.

Each of the government orders, in Ohio, Indiana, Michigan, Louisiana, and North Carolina, restricted access to Teijin facilities by limiting access to essential workers and implementing social distancing. (See Doc. 1 ¶¶ 41-45.) And Teijin has sufficiently alleged that these orders regulated the actual, not suspected, presence of COVID-19 at its facilities. With allegations of test results and its tracking of symptomatic cases, Teijin has plausibly alleged that its employees in these five states contracted COVID-19 prior to or close in time to these orders. (See id. ¶¶ 35-39.)

Even if the government orders were not sufficient to trigger coverage, Teijin has plausibly alleged that the decisions of its

17

officers from March 17 to May 7, 2020, are qualifying orders pursuant to the endorsement. The March 17 decision not only adopted cleaning procedures and the use of isolation rooms for infected employees but also restricted the access of infected employees to Teijin plants. (<u>Id.</u> ¶ 47a.) The May 7 decision "required each visitor to a [Teijin plant] to be 'essential or business critical,'" further restricting access. (<u>Id.</u> ¶ 47b.) Teijin alleges that access was limited by these decisions "due to" and "in response to" the actual presence of COVID-19 at its properties (<u>id.</u> ¶ 47) and that COVID-19 was present at its facilities as early as March 2020 (<u>id.</u> ¶¶ 35-39), close in time to the first order and prior to the second. Therefore, Teijin has pleaded sufficient facts at this stage to plausibly allege that its claimed losses are covered by the Communicable Disease Coverage Endorsement. Sompo's motion to dismiss on this basis will therefore be denied.

## B. Breach of the Covenant of Good Faith and Fair Dealing Claim

Sompo's argument that Teijin's claim for breach of the implied covenant of good faith and fair dealing should be dismissed rests entirely on its contention that Teijin failed to state a claim for breach of contract. (Doc. 10 at 19.) Because the court has found that Teijin has plausibly stated a claim for breach of contract, Sompo's motion to dismiss this claim will be denied.

18

## C. Unfair and Deceptive Trade Practices Claim

### 1. Application of North Carolina Law

Sompo asserts that North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 58-63-15, the basis for Teijin's third claim, does not apply. (Doc. 10 at 20.) It argues that "[i]n evaluating a claim of unfair and deceptive trade practices, North Carolina courts apply the law of the state 'where the last act occurred giving rise the injury.'" (Id. (quoting P & L Dev., LLC v. Bionpharma, Inc., 367 F. Supp. 3d 421, 428 (M.D.N.C. 2019)).) Sompo further contends that North Carolina courts usually find that "economic loss is felt where the plaintiff maintains its principal place of business," which in this case is Michigan. (Id.) Sompo argues, therefore, that the last act giving rise to Teijin's injury occurred outside of North Carolina and thus North Carolina law does not apply to Teijin's claim. (Id.)

Teijin responds that North Carolina law should be applied under the "most significant relationship" test. (Doc. 16 at 30 (quoting Andrew Jackson Sales v. Bi-Lo Stores, Inc., 314 S.E.2d 797, 799 (N.C. Ct. App. 1984)).) It explains that "[i]n deciding choice-of-law, the Fourth Circuit opts for the 'flexible approach' provided by the most significant relationship test in cases involving, as here, 'special multi-state features.'" (Id. (quoting Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 273 (4th Cir. 1982)).) Teijin argues that, pursuant to this test,

19

"[t]he parties have physical operations, Sompo issued the Policy, and Teijin suffered loss all in North Carolina." (Id.) It also contends that even if the court applies the lex loci test, North Carolina law would still apply. (Id. at 31.) This is because, Teijin explains, "[t]he last act giving rise to Teijin's UDTPA claim [occurred] in North Carolina." (Id.) That is, "Sompo made its misrepresentations in North Carolina, Sompo issued its coverage denial letter in North Carolina signed by an employee in its Charlotte office, and Teijin was forced to pay covered clean-up costs in Salisbury[, North Carolina] in connection with Sompo's tortious conduct." (Id. (citations omitted).)

"In a diversity action . . . , the court must apply the choice of law rules of the state in which it sits." M-Tek Kiosk, Inc. v Clayton, No. 1:15CV886, 2016 WL 2997505, at *4 (M.D.N.C. May 23, 2016) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), superseded by statute on other grounds). However, when the supreme court of the state "has spoken neither directly nor indirectly on the particular issue . . . , [the court must] predict how that court would rule if presented with the issue." Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002). The Supreme Court of North Carolina has not addressed the proper test for determining when the UDTPA applies. The North Carolina Court of Appeals has recognized a "split of authority" within its court regarding whether the lex

loci test or the most significant relationship test should be used. Stetser v. TAP Pharm. Prods., Inc., 598 S.E.2d 570, 580 (N.C. 2004). Given this uncertainty, "federal courts generally appear to favor the lex loci rule." SmithKline Beecham Corp. v. Abbott Labs., No. 1:15-CV-360, 2017 WL 1051123, at *6 (M.D.N.C. Mar. 20, 2017). And the Fourth Circuit has instructed that "when the place of injury is open to debate in regard to an unfair trade practices claim, North Carolina choice of law rules require a court to apply the law of the state with the most significant relationship to the transaction." Edmondson v. Am. Motorcycles Ass'n, Inc., 7 F. App'x 136, 150 (4th Cir. 2001).[1] Consistent with this guidance, this court will first apply the lex loci test, but if its application does not produce a clear result, it will turn to the most significant relationship test. See, e.g., P & L Dev., LLC v. Bionpharma, Inc., 367 F. Supp. 3d 421, 427-28 (M.D.N.C. 2019); SmithKline Beecham Corp. c. Abbott Labs., No. 1:15-CV-360, 2017 WL 1051123, at *6-8 (M.D.N.C. Mar. 20, 2017).

The lex loci test asks where the injury was sustained, meaning where the last act occurred that gave rise to the injury. United Va. Bank v. Air-Lift Assocs., Inc., 339 S.E.2d 90, 93-94 (N.C. Ct. App. 1986). The suffering of damages is usually considered such

---

[1] Unpublished opinions of the Fourth Circuit are not precedential but are cited for their persuasive, but not controlling, authority. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

a last act. Id. at 94. Courts sometimes consider the plaintiff's principal place of business as the place of injury for a financial loss. See P & L Dev., LLC, 367 F. Supp. 3d at 429.

Teijin claims its covered losses from Sompo's unfair and deceptive conduct are lost profits due to staffing issues and reduced output, and the costs of cleaning and personal protection equipment. (Doc. 1 ¶¶ 48-49, 80.) It alleges that these losses were incurred at six plants in five states, North Carolina, Louisiana, Indiana, Ohio, and Michigan, and two facilities in Michigan that together are referred to as Teijin's "headquarters." (Id. ¶¶ 7-8 (capitalization omitted).) The complaint does not provide any detail about the relative magnitude of the losses at each of these facilities. While courts often look to the plaintiff's principal place of business as the place of injury for an economic loss felt in multiple states, North Carolina courts have made it clear that this is not a bright line rule. See P & L Dev., LLC, 367 F. Supp. 3d at 429 ("While a plaintiff may feel the economic loss in the state of its principal place of its business, North Carolina courts have rejected a bright line rule requiring such a finding."); Harco Nat. Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 725-26 (N.C. Ct. App. 2010). Teijin has alleged that at least some of its losses were felt in North Carolina. Indeed, North Carolina was among the earliest of its facilities to experience the actual presence of COVID-19 in March of 2020. (See

22

Doc. 1 ¶ 37.) It is at least plausible, therefore, that the UDTPA applies under the lex loci test, and without more, the court cannot determine, as Sompo argues, that it does not.

The parties dispute whether the most significant relationship test applies. Sompo disputes its application, but without analysis; Teijin argues it applies. The most significant relationship test considers (1) the place of injury, (2) the place of the conduct causing the injury, (3) the domiciles of the parties, and (4) the place where the relationship is centered. SmithKline Beecham Corp. c. Abbott Labs., No. 1:15-CV-360, 2017 WL 1051123, at *9 (M.D.N.C. Mar. 20, 2017). The place of injury factor is equivalent to the lex loci test, which the court has already addressed. The place of the conduct - here, the denial of coverage - was North Carolina, as the denial letter was issued from Sompo's Charlotte office. The domiciles of the parties include Delaware, Michigan, New York, and North Carolina. Finally, the place where the relationship is centered, the most important factor, is unclear on this record. See id. ("Courts analyzing North Carolina UDTPA claims under the most significant relationship test focus on 'where the relationship between the parties was created and where it was centered.'" (quoting Jacobs v. Cent. Transp., Inc., 891 F. Supp. 1088, 1111 (E.D.N.C. 1995))). Teijin does not address where the relationship was centered. The parties entered into a contractual relationship, which was created

23

where the contract was delivered; yet the complaint does not provide this factual detail. The policy was issued from Sompo's Charlotte, North Carolina office (Doc. 1 ¶ 9), and communications about the denial of Teijin's insurance claim also came from that office (id. ¶ 51). The complaint does not allege where any other communications about the policy took place. Finally, the policy insured properties throughout North America, including at least Teijin's facilities in North Carolina, Louisiana, Indiana, Ohio, and Michigan. North Carolina, as the place of the conduct, a domicile of the Defendant, and the location of one of Teijin's facilities that suffered loss, does have a significant relationship to the claim. However, the record is not developed on, nor have the parties adequately addressed, the extent to which the policy coverages render North Carolina, versus any other state, the state with the "most" significant relationship to the claim. Thus, without knowing more about where the relationship was centered, the court cannot conclude at this early stage that North Carolina did not have the most significant relationship to the claim such that the UDTPA does not apply. Sompo's motion to dismiss Teijin's UDTPA claim on this basis will therefore be denied.

### 2. Unfair and Deceptive Trade Practices Act

Sompo argues that even if the UDTPA applies, Teijin has failed to state a claim. (Doc. 10 at 20.) A violation of the UDTPA,

24

Case 1:24-cv-00159-TDS-JEP   Document 29   Filed 03/27/25   Page 24 of 30

codified as North Carolina General Statute section 75-1.1, is shown if (1) an unfair and deceptive act or practice (2) in or affecting commerce (3) proximately caused the plaintiff's injury. Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison, 869 S.E.2d 34, 42 (N.C. Ct. App. 2022) (citing Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000)). Whether a practice is unfair or deceptive is a question of law for the court. Gray, 529 S.E.2d at 681 (citing Ellis v. N. Star Co., 388 S.E.2d 127, 131 (N.C. 1990)). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Walker v. Fleetwood Homes of N.C., Inc., 653 S.E.2d 393, 398 (N.C. 2007) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)). "A practice is deceptive if it has the capacity or tendency to deceive." Id. (quoting Marshall, 276 S.E.2d at 403) (alteration adopted).

North Carolina General Statute section 58-63-15(11) defines unfair practices in the context of settling insurance claims. Elliot v. Am. States Ins. Co., 883 F.3d 384, 396 (4th Cir. 2018). Section 58-63-15(11) does not provide a private right of action, however; the remedy is to file a claim under section 75-1.1. Id. "Thus, an individual may file an independent § 75-1.1 claim, or may file a § 75-1.1 claim that relies on a violation of § 58-63-15(11)." Id. (citing Gray, 529 S.E.2d at 684).

25

To establish that a defendant has violated section 58-63-15(11), a plaintiff must show that the defendant committed one of the acts or practices listed in that section and that the act or practice was committed "with such frequency as to indicate a general business practice." Id. (quoting N.C. Gen. Stat. § 58-63-15(11)). However, "conduct that violates § 58-63-15(11) constitutes a violation of N.C.G.S. § 75-1.1, as a matter of law, without the necessity of an additional showing of frequency indicating 'a general business practice,' because 'such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers . . . .'" Id. (quoting Gray, 529 S.E.2d at 683) (alterations adopted); see Country Club of Johnson Cnty., Inc. v. U.S. Fid. & Guar. Co., 563 S.E.2d 269, 279 (N.C. Ct. App. 2002) (stating that "a plaintiff is not required to prove a violation of N.C. Gen. Stat. § 58-63-15(11) in order to succeed on an independent claim under N.C. Gen. Stat. § 75-1.1" but the court "may look to the types of conduct prohibited by N.C. Gen. Stat. § 58-63-15(11) for examples of conduct which would constitute an unfair and deceptive act or practice").

The Fourth Circuit has noted that it is "unclear whether conduct that violates § 58-63-15 is a per se violation of § 75-1.1, or instead whether that conduct satisfies § 75-1.1's conduct requirement of an unfair or deceptive act or practice," requiring additional proof of commerce and proximate cause. Elliot, 883

F.3d at 396 n.7. Given this lack of clarity and the North Carolina courts' indication that practices listed by section 58-63-15(11) constitute examples of unfair and deceptive acts or practices, <u>see</u> <u>Gray</u>, 529 S.E.2d at 683; <u>Country Club</u>, 563 S.E.2d at 279, the court will proceed under the typical framework for a claim brought under section 75-1.1. That is, the court will consider conduct that violates section 58-63-15(11) as a violation of section 75-1.1, but will otherwise require a showing of commerce[2] and proximate causation.

### 3. Deceptive Trade Practice

Sompo first argues that Teijin has failed to sufficiently allege that Sompo engaged in an unfair and deceptive act or practice. (Doc. 10 at 20–21.) It explains that "[a] mere breach of contract, standing alone, is not sufficient to maintain a UDTPA claim"; rather, there must be aggravating circumstances. (<u>Id.</u> at 21.)

Teijin responds that Sompo violated the UDTPA by "misrepresent[ing] the Policy by ignoring the Communicable Disease Coverage Endorsement, . . . assert[ing] instead a physical loss or damage requirement for coverage where none exists, . . . fail[ing] to conduct a reasonable (or any) investigation, and . . . in denying the claim, fail[ing] to provide a reasonable explanation

---

[2] Sompo does not challenge whether Teijin has met the commerce element (<u>see</u> Doc. 10 at 20-21), so the court does not address it at this time.

based on the Policy." (Doc. 16 at 29-30.) It contends that these actions "violate[d] N.C. Gen. Stat. § 58-63-15 . . ., which constitutes an unfair method of competition or unfair or deceptive act or practice in violation of N.C. Gen. Stat. § 75-1.1." (Doc. 1 ¶ 76.)

Teijin's allegations are sufficient to support its claim that Sompo misrepresented the policy and failed to provide a reasonable explanation for the denial, both of which are unfair and deceptive acts or practices under North Carolina law. See N.C. Gen. Stat. § 58-63-15(11)(a), (n). Teijin alleges that Sompo wrongfully represented in an initial coverage letter and then in a denial letter that the Communicable Disease Coverage Endorsement was not part of the policy. (Doc. 1 ¶¶ 51, 54.) In denying coverage, Sompo also allegedly claimed that direct physical loss was required under the policy, when the plain language of the endorsement is to the contrary – a position Sompo has since abandoned in this litigation. (Id. ¶ 54.)

Deception accompanying a breach of contract is sufficient to show aggravating circumstances under the UDTPA. DENC, LLC v. Phila. Indem. Ins. Co., 32 F.4th 38, 52-53 (4th Cir. 2022) (citing Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989)). Teijin's allegations are sufficient to plausibly allege deception because Sompo's explanation of the coverage denial was plainly contrary to the express terms of the Communicable Disease

28

Coverage Endorsement and is contrary to Sompo's acknowledgment that the physical loss provision is inapplicable. See DENC, LLC, 32 F.4th at 52 (holding that an insurance denial letter had the "capacity to mislead" and thus violated the UDTPA because it "fail[ed] to reasonably explain 'the basis in the insurance policy in relation to the facts' for its denial").

### 4. Proximate Causation

Sompo further argues that, even if it committed an unfair or deceptive act, Teijin cannot show that it proximately caused Teijin's injury. (Doc. 10 at 21.) Sompo asserts that "[t]o satisfy proximate cause, a plaintiff must demonstrate that they detrimentally relied on the defendant's alleged misrepresentation or deception." (Id.) Sompo contends that Teijin has not alleged detrimental reliance. (Id.)

Teijin responds that Sompo's conduct did cause its injury, arguing that "[a]s a result of Sompo's unfair and deceptive misrepresentations about coverage and its failure to conduct a reasonable coverage investigation, Teijin incurred attorneys' fees and costs to obtain benefits to which it was entitled." (Doc. 16 at 31 (citations omitted).) Teijin also relies on DENC, LLC v. Philadelphia Indemnity Insurance Company, 32 F.4th 38, 53 (4th Cir. 2022), asserting that "the Fourth Circuit has found similar insurer conduct regarding deceptive denial letters to violate [the] UDTPA." (Doc. 16 at 31–32.)

29

In DENC, the court held that, in the insurance context, where the defendant had engaged in an unfair and deceptive trade practice by issuing a deceptive denial letter, proximate causation was shown. 32 F.4th at 52–53. It reasoned that the deceptive denial letter also established the breach of contract, and thus there was "one continuous transaction." Id. at 53 (citations and internal quotation marks omitted). The court explained that a district court should not "apply a separate proximate-cause analysis to the contract and UDTPA damages" under such circumstances. Id. (citations omitted). Here, Sompo's allegedly deceptive denial letter also establishes the breach of contract, as in DENC. Therefore, Teijin has alleged proximate causation, and Sompo's motion to dismiss on this basis will be denied.

## III. CONCLUSION

For the reasons stated,

IT IS ORDERED that Sompo's motion to dismiss (Doc. 9) is DENIED.

                         /s/   Thomas D. Schroeder
                         United States District Judge

March 26, 2025